UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

                                  ::

UNITED STATES OF AMERICA,            :       03 CR 1368 (ARR)

                                    :

                                    :       NOT FOR ELECTRONIC

   -against-                           :       OR PRINT

                                    :       PUBLICATION

GARY LALL, also known as "Indian," ANTHONY     :

GULSTON, RICHARD PITCHER, also known as      :       OPINION AND ORDER

"Rags," and RAFAEL RODRIGUEZ,           :

                                    :

                Defendants.          X

------------------------------------------------------------------

ROSS, United States District Judge:

      Defendant Rafael Rodriguez was convicted, on June 10, 2005, of conspiring to import

marijuana into the United States, in violation of 21 U.S.C. §§ 952(a) and 963, and of

conspiring to distribute and possess with intent to distribute marijuana, in violation of 21

U.S.C. §§ 841(a) and 846. Rodriguez now moves for a judgment of acquittal pursuant to Fed.

R. Crim. P. 29. Rodriguez argues that the government failed to present sufficient evidence to

support his conviction in that the evidence did not give rise to a reasonable inference that

Rodriguez joined any narcotics conspiracy. Rather, Rodriguez argues that the evidence

indicated, at most, that he was attempting to buy marijuana from co-defendants Gary Lall and

Anthony Gulston and that, as a willing buyer, he was not, as a matter of law, a conspirator.

For the reasons set forth below, the court denies Rodriguez's motion for acquittal. The court

determines, however, that the evidence was insufficient to support the jury's finding that either

Rodriguez's or Gulston's offenses involved fifty kilograms or more of marijuana.

## BACKGROUND

The government adduced evidence at trial showing a multifaceted conspiracy to import narcotics into the United States through John F. Kennedy Airport ("JFK"), and to possess with intent to distribute those narcotics, with Gary Lall as the central organizing figure. Lall, Gulston, and Rodriguez were all American Airlines employees. The evidence relied on by the government to prove Rodriguez's participation in conspiracies to import and distribute marijuana involves an October 13, 2003 shipment of seventy-seven pounds of marijuana on an American Airlines flight originating in Jamaica that was seized by Customs officials at JFK. The government also adduced other evidence in order to demonstrate Rodriguez's participation in a marijuana distribution conspiracy.

### The October 13, 2003 Importation

Gary Lall discussed importing marijuana into the United States with a Jamaican supplier in a September 10, 2003 wiretapped conversation. Government's Ex. 3A. Lall and the supplier discussed ways to import marijuana and the availability of "the person who will come and clear it" from the airplane. Id. at 2-5. When Lall asked whether the "green sleeve," a coded reference to marijuana, would be "eighty. 8-0." presumably meaning eighty pounds, the supplier confirmed that it would. Id. at 5. The call ended with Lall assuring the supplier that he would confer with his associates and get back in touch with the supplier. Id. at 6.

Approximately one hour later, Lall sent Anthony Gulston a numeric page. Government's Ex. 3B. Late that evening, Lall called Gulston and inquired about his work schedule. Government's Ex. 3C. After Gulston indicated that he was off work Thursdays and Fridays, Lall told Gulston that he would "let [him] know what's up then," explaining that he

would get back to "them," presumably the Jamaican supplier, and "tell them [Gulston's] schedule." Id. When Lall asked Gulston if he "could pull it," Gulston replied "yeah, no problem." Id.

Approximately two weeks later, on September 27, 2003, Lall called Gulston to inquire about his availability the following Monday, September 29. Government's Ex. 3D. Gulston indicated that he was on vacation until the following Saturday, which would have been October 4, 2003, and asked whether Lall had "something coming." Id. Lall then said that they would "do the party for that Monday after [Gulston] c[a]me back," which would have been October 6, 2003. Id.

On September 29, 2003, Lall again called his Jamaican supplier. Government's Ex. 3F. At the end of the conversation, the supplier reminded Lall that "it's coming in next week you know." Id. The supplier then stated "[w]in, lose, or draw I am coming next week you know," repeating that he was "coming Monday . . . ." Id. Lall then confirmed that "the brother's coming back," presumably meaning that Gulston was returning from his vacation. Id.

Later that day, Lall called defendant Rafael Rodriguez. Government's Ex. 5E. Lall told Rodriguez that he had just received an eight-hundred pound shipment of marijuana, id., a shipment Lall had discussed at length with his Jamaican supplier the previous day. Government's Ex. 3E. Rodriguez then indicated that he had spoken "with this guy over there from the aah . . . from the midnights and he hooked it up." Id. Rodriguez explained that "[h]e told me . . . he told me to go, you know. Whenever you're ready he told me just let him know and he'll give me whatever I want over there." Id. Rodriguez clarified that he had spoken with "[t]he midnight guy from the midnight club . . . [y]ou know, Anthony," referring to Gulston.

3

Id. Rodriguez further stated that "he told me you already spoke to him and now we got together it's all good dude." Id. Lall concluded the conversation stating "[y]eah I know it sounds good so once we're ready." Id.

No drug shipment was seized on Monday, October 6, 2003, and the record does not include any wiretapped conversations after Monday, September 29 discussing a shipment scheduled for that date. On Monday, October 13, 2003, however, at approximately 1:36 p.m., Lall received a call from his Jamaican supplier, who told him that a shipment of drugs was en route to JFK. Government's Ex. 3K. The supplier told Lall "[y]ou've got to find your boys and tell them the thing is there, they couldn't stop it man." Id. The supplier explained that he would "get the information [about the flight] and call you and give it to you." Id. The supplier then told Lall to have his associates offload the airplane if they could. "Just see what they can do man, if they can't save it they can't save it, if they can save it, anything they want to do, you know." Id. Approximately ten minutes later, Lall left a message for Gulston, telling him to "give me a call. I need you later." Government's Ex. 3L. Later that day, at 2:10 p.m., Lall's Jamaican source called Lall and told him that the shipment was on "the only one that left." Government's Ex. 3M.

In the afternoon of October 13, 2003, Customs officials seized a wooden pallet containing 77 pounds of marijuana, approximately thirty-five kilograms, from American Airlines flight 1190 originating in Jamaica. The marijuana had been packed into hollowed-out wooden blocks that formed part of a pallet that was stacked with buckets of pepper sauce. Trial Transcript [hereinafter "Tr."] at 629. Robert Lopez, a co-conspirator who was to assist with that importation, testified that the cargo shipment would have gone to the freight

4

warehouse. Tr. at 867, 871. Gulston worked the midnight shift in that warehouse. Tr. at 76-77.

Gulston called Lall shortly after 10:00 p.m., at the beginning of his shift, to find out what had happened to the drug shipment. Government's Ex. 3R. Gulston left Lall the following message: "It's me Anthony. Aahm . . . what's the story, what's going on? Let me know. Alright. I've been back to work I spoke to Ralphie [Rodriguez] and aahm . . . he hasn't gotten back to me either. Call me later." Id. Lall and Gulston apparently spoke again that day because on October 14, 2003, the following day, Lall left Gulston a message, telling him to "[l]et me know if you found out aahm . . . anything that I told you about yesterday," apparently referring to the failed importation. Government's Ex. 3V.

Other Narcotics Activities

The government adduced evidence at trial that, on September 8 and 9, 2003, Rodriguez and Lall discussed purchasing marijuana from a supplier named Lee and that Rodriguez contacted Lee about buying marijuana. Government's Ex. 5A, 5B. The government also adduced evidence that, on October 10, 2003, Rodriguez left a message for Lall. Government's Ex. 5G. In that call, Rodriguez asked "what's the best price you can get me for two," referring to the eight-hundred pound shipment of marijuana Lall had discussed with him on September 29, 2003. Id.; Government's Ex. 5E.

DISCUSSION

I.      Sufficiency Standard

A defendant seeking to overturn a conviction on the ground that the evidence was insufficient bears a heavy burden. United States v. Russo, 74 F.3d 1383, 1395 (2d Cir. 1996).

5

The court must "consider the evidence in its totality, not in isolation, and the government need not negate every theory of innocence." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000). The court must also give deference to the jury's assessment of the credibility of the witnesses and to its selection among competing inferences. United States v. Pelaes, 790 F.2d 254, 259 (2d Cir. 1986). "The court must be careful to avoid usurping the role of the jury," Autuori, 212 F.3d at 114 (citation and internal punctuation omitted), and must not substitute its own determination of credibility or relative weight of the evidence for that of the jury. Id. "If the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." Id. (citation and internal punctuation omitted). A conviction challenged on sufficiency grounds will be affirmed if, viewing all the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in its favor, a reviewing court finds that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see United States v. Carson, 702 F.2d 351, 361 (2d Cir.) ("Our inquiry is whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt") (citations omitted), cert. denied, Mont v. United States, 462 U.S. 1108 (1983).

While "only slight evidence is required to link another defendant with a conspiracy once the conspiracy has been shown to exist," United States v. Aleskerova, 300 F.3d 286, 292 (2d Cir. 2002) (citation and internal quotation marks omitted), "the government must present some evidence from which it reasonably can be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined

6

and participated in it." United States v. Rodriguez, 392 F.3d 539, 545 (2d Cir. 2004) (internal

quotation marks and citation omitted). Moreover, the "conviction cannot be sustained unless

the Government establishes beyond a reasonable doubt that the defendant had the specific

intent to violate the substantive statutes." Gaviria, 740 F.2d at 183 (citations and internal

punctuation omitted). "Proof that the defendant knew that some crime would be committed is

not enough." Rodriguez, 392 F.3d at 545 (internal quotation marks and citation omitted)

(emphasis in original).

   To support a conviction, the relevant conspiracy statutes require proof that Rodriguez

knowingly engaged in each conspiracy with the specific intent to commit the offenses that

were the objects of that conspiracy. "[W]here the Government seeks to prove a fact that is also

an element of the offense by circumstantial evidence, [the court] must be satisfied that the

inferences are sufficiently supported to permit a rational juror to find that the element, like all

elements, is established beyond a reasonable doubt." United States v. Friedman, 300 F.3d 111,

124 (2d Cir. 2002) (citation and internal quotation marks and punctuation omitted).

"Circumstantial evidence of knowledge and specific intent sufficient to sustain a conviction

must include some indicia of the specific elements of the underlying crime." United States v.

Samaria, 239 F.3d 228, 235 (2d Cir. 2001). Such indicia come in a variety of forms, including:

evidence that the defendant participated in conversations directly related to the substance of the

conspiracy; possession of or mention in documents important to the conspiracy; proof that the

defendant exercised authority within the conspiracy; and evidence indicating that defendant

received a share of the profits from the conspiracy. Id. Additional circumstantial evidence

supporting a conspiracy conviction might include evidence establishing that the defendant

7

associated with the conspirators in furtherance of the conspiracy or the defendant's presence at critical stages of the conspiracy that could not be explained by mere happenstance. Aleskerova, 300 F.3d at 292-93.

II.    Sufficiency of the Evidence to Sustain Rodriguez's Conviction

Defendant Rodriguez correctly argues that mere association with conspirators or knowledge of the existence of a conspiracy are not enough to demonstrate that he intentionally joined any conspiracy. Rodriguez further argues that no evidence reasonably supports the inference that he joined a conspiracy either to import or to distribute marijuana. Rather, defendant contends that the evidence supports, at most, the inference that he intended to buy marijuana from Lall and Gulston. Characterizing the relationship between himself and his co-defendants as that between a buyer and a seller, defendant invokes the "single transaction" rule to argue that his desire to purchase marijuana from Lall and Gulston does not place him in either the importation or distribution conspiracy charged in the indictment.

The evidence against Rodriguez is far from overwhelming. The court will discuss each piece of evidence in turn, addressing the October 13, 2003 importation of marijuana before considering the evidence of Rodriguez's involvement in marijuana purchases, drawing all reasonable inferences in the government's favor and viewing those inferences cumulatively.

A.    Marijuana Importation Conspiracy

On Monday, October 13, 2003, Customs officials seized from American Airlines flight 1190 originating in Jamaica seventy-seven pounds of marijuana, which is approximately thirty-five kilograms, that had been concealed in a wooden pallet. The evidence indicates that Lall orchestrated this importation in concert with a Jamaican supplier, discussing on September 10,

8

2003, the importation of "eighty, 8-0" pounds of "green sleeve." Government's Ex. 3A. The
evidence also indicates that Lall spoke that same day with Gulston, an American Airlines
employee who worked in the freight warehouse and who, as a result, had access to freight
shipments offloaded from in-bound flights and stored in the warehouse pending collection by
the intended recipient. Government's Ex. 3C. Lall inquired about Gulston's work schedule,
which he was to convey to his Jamaican source. Id. Lall spoke with Gulston again on
September 27, 2003, at which point Gulston told Lall that he was on vacation and would not
return to work until October 4, 2003, a Saturday. Government's Ex. 3D. Lall indicated that
they would "do the party for that Monday" after Gulston had returned, id., and two days later,
on September 29, 2003, Lall's Jamaican supplier confirmed that he would be sending a
shipment that Monday. Government's Ex. 3F. Lall also spoke with Rafael Rodriguez on
September 29. Government's Ex. 5E. After Lall informed Rodriguez that he had just received
an eight-hundred pound shipment of marijuana, Rodriguez told Lall that he had spoken to
Anthony "from the midnight club," a reference to Gulston, who worked the midnight shift in
the freight warehouse. Id. Rodriguez told Lall that "[w]henever you're ready he told me just
let him know and he'll give me whatever I want over there." Id. Rodriguez also indicated that
Gulston had told him that he had spoken directly with Lall and that "now [Gulston and
Rodriguez] got together it's all good dude." Id.

No evidence in the record, either in the form of seized marijuana or wiretapped
conversations, indicates that a shipment was attempted on Monday, October 6, 2003. The
record does include, however, a number of calls surrounding the seized, October 13, 2003
shipment. Early that afternoon, Lall's Jamaican supplier, apparently wary that there would be

problems at JFK, explained that he had been unable to stop the shipment and that Lall's associates should "save it" if they could. Government's Ex. 3K. After Lall heard from his Jamaican supplier, he left a voice message for Gulston, telling Gulston that he would "need [him] later." Government's Ex. 3L. Gulston's midnight shift ran from 10:00 p.m. to 6:30 a.m. Tr. at 77. At approximately 10:02 p.m. that night, shortly after beginning his shift, Gulston left a voice message for Lall explaining that he had been "back to work" and that he had "spoke[n] to Ralphie [Rodriguez]" who had not "gotten back to [him] either." Id.

While the case is a close one, given that the court must view the evidence in the light most favorable to the government and draw all reasonable inferences in the government's favor, giving deference to the jury's assessment of credibility, the court must conclude that the government presented sufficient evidence from which the jury could have found that Rodriguez knowingly and intentionally participated in the marijuana importation conspiracy. The court reaches this conclusion viewing the evidence cumulatively and in its totality.

Gulston had a clear role to play in the importation conspiracy. The marijuana had been concealed in a wooden pallet stacked with buckets of pepper sauce, a shipment that, had it not been interdicted, would have gone to the cargo warehouse where Gulston worked. Gulston, it is fair to infer, would have provided Lall or his associates access to the pallet. The court must consider the evidence implicating Rodriguez in light of this context.

On September 29, 2003, Rodriguez indicated to Lall that he had spoken to Gulston. Government's Ex. 5E. The context of the conversation clearly indicates that the interaction between Rodriguez and Gulston was to occur at the airport. Rodriguez referred to Gulston as "[t]he midnight guy from the midnight club," meaning that Gulston worked the midnight shift,

10

and relayed that Gulston would "give me whatever I want over there," meaning, it is reasonable to infer, at the freight warehouse. Id. Rodriguez further indicated to Lall that he knew Gulston and Lall had already spoken, and it is reasonable to infer this as a reference to the September 27, 2003 call, two days prior, between Gulston and Lall. Government's Ex. 3D. The government argued at trial that Rodriguez's role in the October 13, 2003 importation was to retrieve the pallet from the freight warehouse, Tr. at 1200, 1203, and to ensure Gulston's availability at the warehouse. Id. at 1374. The defense has contended, in light of the direct communications between Lall and Gulston, that Rodriguez's role as a liaison with Gulston was therefore redundant. Defendant's Reply Brief at 3-4. The court notes that, even assuming that limited version of defendant's role to be true, Rodriguez acknowledged the redundancy, stating that after Lall and Gulston had spoken, "now we [Rodriguez and Gulston] got together it's all good dude."[1] Government's Ex. 5E. The question before the court, however, is not whether Rodriguez's role was redundant, but whether there is sufficient evidence in the record that he knew of the marijuana importation conspiracy and knowingly joined and participated in it, even if his participation was not necessary to achieve the conspiracy's goal. Considering this question, the court finds it to be a reasonable inference to conclude from Lall and Rodriguez's September 29, 2003 conversation that Rodriguez had spoken with Gulston about retrieving a shipment from the cargo warehouse. Defendant has argued that this conversation is "entirely consistent" with Rodriguez's attempt "to buy some marijuana from the members of the

---

[1]As discussed below, the court determines that the jury could reasonably have inferred that Rodriguez was to retrieve the drugs from Gulston at the warehouse but assumes, arguendo, for the purposes of analyzing the sufficiency of the evidence pertaining to the importation count a more limited, logistical role.

11

conspiracy." Defendant's Reply Brief at 4. Drawing all reasonable inferences in the government's favor, as it must, the court concludes that the more reasonable inference is that Rodriguez had discussed the same matter with Gulston that Lall had. Rodriguez's recount of his conversation with Gulston indicates that the conversation was confirmatory in nature: "[H]e told me you already spoke to him and now we got together it's all good dude." Government's Ex. 5E. Knowing that Lall had talked to Gulston about his work schedule and his availability at the freight warehouse, the jury was entitled to draw the reasonable inference that Rodriguez had spoken to Gulston about the same subject.

As the court has previously noted, the evidence supporting Rodriguez's conviction for conspiracy to import marijuana is far from overwhelming, indicating that Rodriguez may have played a minor or even duplicative role. It is well settled, however, that "[t]he size of a defendant's role does not determine whether that person may be convicted of conspiracy charges. Rather, what is important is whether the defendant willfully participated in the activities of the conspiracy with knowledge of its illegal ends." United States v. Vanwort, 887 F.2d 375, 386 (2d Cir. 1989).

Rodriguez also contends that he is entitled to the benefit of the "single transaction rule" because his involvement with narcotics was limited to an interest in purchasing marijuana from Lall and Gulston. He argues, therefore, that the evidence was insufficient as a matter of law to establish that he knowingly joined in the charged importation conspiracy. The "single transaction rule" was adopted by the Second Circuit in United States v. Zeuli, 137 F.2d 845 (2d Cir. 1943). The rule states that "if a crime necessarily involves the mutual cooperation of two persons, and if they have in fact committed the crime, they may not be convicted of a

12

conspiracy to commit it." Id. at 846. "In conspiracy cases, where an 'outsider' commits a single crime with a member of an existing conspiracy and is thereafter accused of having 'joined' that conspiracy by virtue of his criminal association with one of its members, courts have applied the single transaction rule to hold that the mutual cooperation between the outsider and the conspirator in the context of the single crime is not a substitute for proof of an independent agreement on the part of the outsider to join the ranks of the conspiracy." United States v. Zabare, 871 F.2d 282, 287 (2d Cir. 1989). Thus, standing alone, purchase of contraband from a member of an existing conspiracy does not necessarily make the purchaser a member of that conspiracy. Id.; United States v. Pena, No. 89 Cr. 410 (SWK), 1990 WL 103970, *4 (S.D.N.Y. July 18, 1990) ("It is well established that the typical buyer/seller relationship in itself is an insufficient basis for inferring the existence of a conspiracy."). This rule provides a counterweight to the "tendency in conspiracy cases for the jury to believe that a defendant must have been involved in the alleged over-all conspiracy once it finds that the defendant committed one of the minor acts which the prosecution contends is but an extension of the greater conspiracy." United States v. Alegria, No. S 90 Cr. 450 (RWS), 1991 WL 238223, *8 (S.D.N.Y. Nov. 6, 1991) (quotation marks and citation omitted).

It is also well-settled in the Second Circuit, however, that "a defendant's participation in a single transaction can suffice to sustain a charge of knowing participation in an existing conspiracy." Zabare, 871 F.2d at 287. "The test that has evolved for determining whether a single act is sufficient to support a conspiracy conviction is whether the qualitative nature of the act viewed in the context of the entire conspiracy in a particular case supports beyond a

13

reasonable doubt the inference that an individual is involved in a conspiracy." Id. (citation and internal quotations and punctuation omitted).

As discussed above, the jury could reasonably have inferred from the evidence adduced by the government that Rodriguez played a role in recruiting Gulston to participate in the October 13, 2003 importation or to ensure his availability at the cargo warehouse that evening. Rodriguez is thus not entitled to the benefit of the single transaction rule on this count, as the evidence gives rise to a reasonable inference that he was an active participant in the conspiracy rather than an "outsider" who sought simply to purchase marijuana from Lall and Gulston. Moreover, the qualitative nature of Rodriguez's September 29, 2003 conversation with Lall, viewed in the context of Lall's conversations with his Jamaican supplier and Gulston, as well as Gulston's indication that he had sought information from Rodriguez on the night of October 13, 2003, supports beyond a reasonable doubt that Rodriguez was involved in the conspiracy. Thus, to the extent that Rodriguez's participation in the importation conspiracy is limited to a single act, evidence of that act is sufficient to sustain a charge of knowing participation in an existing conspiracy.

Defendant has also argued that the circumstantial evidence of Rodriguez's specific intent to join the importation conspiracy lacks any indicia of the specific elements of the underlying crime as described in Samaria, 239 F.3d at 235, and Aleskerova, 300 F.3d at 292-93. Defendant correctly argues that the government adduced no evidence that Rodriguez: (1) possessed or was mentioned in any documents important to the conspiracy, other than Gulston's address book, which included hundreds of names; (2) exercised any authority within the conspiracy; or (3) received a share of the profits from the conspiracy. The government did

14

adduce evidence, however, that Rodriguez "participated in [a] conversation[] directly related to the substance of the conspiracy." Samaria, 239 F.3d at 235. The court thus reiterates that the evidence adduced by the government was sufficient to establish that Rodriguez associated with the conspirators with the specific intent of importing marijuana into the United States.

### B.    Marijuana Distribution Conspiracy

As a preliminary matter, the court finds that three wiretapped conversations bearing upon Rodriguez's desire to purchase marijuana would be insufficient, on their own, to sustain a conviction for conspiracy to distribute marijuana.[2] Thus, the court must consider whether the

---

[2]One of those calls, a message Rodriguez left for Lall on October 10, 2003, clearly does not put Rodriguez in a marijuana distribution conspiracy. Government's Ex. 5G. In that call, approximately eleven days after Lall first informed Rodriguez that he had just received an eight-hundred pound marijuana shipment, Government's Ex. 5E, Rodriguez asked what was the "best price" Lall could give him for "two." Government's Ex. 5G. The call does not give rise to a reasonable inference that Rodriguez was a member of a conspiracy to distribute the eight-hundred pounds of marijuana that Lall had received. Rather, the call indicates that Rodriguez sought to purchase marijuana from Lall, implicating Rodriguez in a buyer-seller relationship with Lall. While even one pound of marijuana is consistent with distribution, Tr. at 1055-56, there is simply no evidence in the record that the parties agreed to participate in a larger conspiracy. The other two calls between Lall and Rodriguez, on September 8 and 9, 2003, involve a plan whereby Rodriguez would purchase marijuana from one of Lall's contacts, someone named "Lee." Government's Ex. 5A, 5B. The government did not argue in its brief that these calls constitute evidence of Rodriguez's participation in a marijuana distribution conspiracy. To the contrary, the government apparently conceded that these calls do not constitute proof of Rodriguez's participation in a distribution conspiracy. Government's Brief at 19n.8. In any event, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in its favor, these calls do not give rise to a reasonable inference that Lall and Rodriguez conspired together to distribute marijuana purchased from Lee. See United States v. Tyler, 758 F.2d 66, 69 (2d Cir. 1985) (holding that, on its own, evidence indicating that a defendant helped a willing buyer locate a willing seller is insufficient to establish the existence of an agreement between the facilitator and the seller). The instant case is not on all fours with Tyler. In that case, the defendant had been approached on the street by an undercover police officer and was helping him find a heroin dealer. The court found that there was no evidence indicating the existence of a conspiracy between the defendant and the seller considering that there was no evidence, inter alia, that defendant had a specific source in mind, that defendant knew where to locate the dealer, or that defendant had had any prior dealings with the dealer. Id. at 68-69. In

evidence regarding Rodriguez's role in the October 13, 2003 importation is sufficient to sustain a conviction for conspiracy to distribute marijuana.

As analyzed above, the jury could reasonably infer from the evidence adduced at trial that Rodriguez contacted Gulston with the aim of ensuring his participation in or availability for the October 13, 2003 importation of 77 pounds of marijuana. It is a reasonable inference that this shipment, stored inside a wooden pallet loaded with freight, would have gone to the cargo warehouse where Gulston worked had it not been interdicted by Customs officials. The jury could have reasonably inferred that Gulston's role was to transport the pallet in question from the warehouse to another of Lall's associates or to provide one of those associates access to the warehouse in order to obtain the pallet. While the evidence is not overwhelming, the jury further could have reasonably inferred that Rodriguez was to retrieve the drugs from the warehouse. In Rodriguez's September 29, 2003 telephone conversation with Lall, he told Lall that Gulston would "give me whatever I want over there," meaning, it is reasonable to infer, at the warehouse. Government's Ex. 5E. That Gulston contacted Rodriguez and Lall shortly after his shift began on October 13, 2003, inquiring about the status of their arrangement, further supports that inference.

Under the statute, "distribute" as used in 21 U.S.C. § 841 means to deliver, 21 U.S.C. § 802(11), and deliver means "the actual, constructive, or attempted transfer of a controlled

---

the instant case, Lall gave Rodriguez Lee's telephone number, Government's Ex. 5A, and the call, as well as other evidence in the case, indicated that Lall had prior drug dealings with Lee. While it may be that Lall was more than a disinterested person helping a willing buyer locate a willing seller, the government adduced no evidence that would warrant the inference that Lall was participating in this deal in anything but a facilitator's role or that he intended it to succeed for his own benefit.

substance." 21 U.S.C. § 802(8). Whether Rodriguez's role was to receive the drug-filled pallet from Gulston and transfer it himself to a co-conspirator or he simply arranged for Gulston to make that transfer, both scenarios being reasonable inferences from the evidence, the evidence was sufficient to support a conviction for conspiracy to distribute marijuana. The jury could reasonably have inferred that Rodriguez joined the conspiracy with the intent either to deliver the drugs from one part of the airport to another himself or to coordinate that delivery. In either event, the evidence, although far from overwhelming, was sufficient to sustain a conviction for conspiracy to distribute marijuana.

III.    _Apprendi_ Issue

While the jury indicated on its special verdict sheet that the importation and distribution conspiracies for which Rodriguez was convicted each involved fifty kilograms or more of marijuana, the October 13, 2003 seizure involved 77 pounds of marijuana, which is approximately thirty-five kilograms. The government adduced no other evidence of importations or distribution schemes involving Rodriguez at trial. The court thus concludes that the evidence was insufficient for the jury to properly conclude, beyond a reasonable doubt, that either of the counts of which Rodriguez was convicted involved fifty kilograms or more of marijuana. Although no motion for acquittal has been filed on Gulston's behalf, the analysis regarding the amount of marijuana proved to the jury is the same with respect to him as with respect to Rodriguez. The jury concluded that the government had not proven Gulston's participation in an importation and distribution conspiracy involving five kilograms or more of cocaine, and the only evidence of his participation in a marijuana conspiracy involved the October 13, 2003 seizure of 77 pounds of marijuana.

17

Having determined that the jury could not properly have found that either defendant was involved in a conspiracy involving fifty kilograms or more of marijuana, the court concludes that <u>Apprendi</u> requires that the defendants be sentenced pursuant to 21 U.S.C. § 841(b)(1)(D), which provides that, for an offense involving less than fifty kilograms of marijuana, a defendant shall "be sentenced to a term of imprisonment of not more than 5 years." As a result, the mandatory bail revocation provisions of 18 U.S.C. §§ 3142(f)(C) and 3143 do not apply.

The court has scheduled a status conference in this matter for Wednesday, July 13, 2005. Any briefs the parties wish to submit on this issue should be faxed to chambers by 4:00 p.m. on Tuesday, July 12, 2005.

## CONCLUSION

For the foregoing reasons, Rodriguez's motion for acquittal is denied. The court determines, however, that the evidence adduced at trial was insufficient to support the jury's finding that Rodriguez's and Gulston's offenses involved fifty kilograms or more of marijuana.

SO ORDERED.

Allyne R. Ross
United States District Judge

Dated: July 11, 2005
       Brooklyn, New York

18

SERVICE LIST:

<u>Attorney for the United States</u>
Steven D'Alessandro
United States Attorneys Office
147 Pierrepont Street
Brooklyn, NY 11201

E. Scott Morvillo
United States Attorneys Office
147 Pierrepont Street
Brooklyn. NY 11201

<u>Attorneys for Defendant Rafael Rodriguez</u>
Sabrina P. Shroff, Esq.
350 Broadway
Suite 700
New York, NY 10013

Christopher Renfroe
Renfroe & Quinn
118-35 Queens Blvd.
Forest Hills. Queens 11375